Danuta BARTNIAK, Plaintiff,

v.

CUSHMAN & WAKEFIELD, INC., Defendant.

No. 99 CIV.11916 RLE.

United States District Court, S.D. New York.

Sept. 25, 2002.

Danuta Bartniak, Brooklyn, NY, Pro se.

Robert A. Sparer, Clifton, Budd & Demaria, LLP, New York City, for Defendant.

## OPINION & ORDER

ELLIS, United States Magistrate Judge.

### I.  INTRODUCTION

On April 6, 2000, plaintiff Danuta Bartniak ("Bartniak") filed an amended[1]

---

1. Bartniak's original complaint was filed on December 9, 1999, but was never served upon defendants.

complaint against her former employer, defendant Cushman & Wakefield, Inc. ("Cushman"), alleging claims of: sexual harassment, national origin discrimination, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, Executive Law § 290 et seq.; and the New York City Charter and Code, § 8–107. The original complaint also contained claims against individual defendants Jesus Agrelo ("Agrelo") and Ali Nagi ("Nagi"). By stipulation, plaintiff withdrew her claims against Agrelo and Nagi as well as the Executive Law and Administrative Code claims before Cushman answered. Prior to trial, Cushman moved for summary judgment, arguing that Bartniak had failed to file a timely charge with the Equal Employment Opportunity Commission ("EEOC"). By Opinion and Order dated November 26, 2001, this Court denied the motion, holding that Bartniak was entitled to equitable tolling because she had been misled by the EEOC.

Bartniak thus proceeded to trial on her Title VII claims for sexual harassment, national origin discrimination, retaliation and constructive discharge. The case was tried to a jury from November 27 to December 3, 2001. During the course of the trial, Cushman moved to dismiss all of Bartniak's liability claims, and also her claim for punitive damages. The Court granted the motion with respect to the claims of national origin, retaliation, and constructive discharge, and with respect to punitive damages, but denied the motion with respect to Bartniak's claim based on a hostile work environment. The Court denied Bartniak's motion to strike Cushman's affirmative defense based on the principles enunciated by the United States Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burling-*

*ton Indus., Inc. v. Ellerth*, 524 U.S. 742, 760–762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Court also denied Bartniak's request to include a jury instruction on sexual favoritism. In addition, the Court ruled that certain exhibits proposed by Bartniak were inadmissible during the trial.

Replying to questions on the Court's special verdict form, the jury found that Bartniak had been subjected to a hostile work environment by a co-worker, but not by a supervisor, and had reported the offending behavior to Cushman. The jury, however, found that Cushman had exercised reasonable care to prevent and correct any sexual harassment in the workplace. Further, the jury found that Barniak had unreasonably failed to take advantage of the preventive or corrective opportunity provided by Cushman.

Bartniak now renews her motion to strike Cushman's affirmative defense as a matter of law. In addition, plaintiff moves the Court for the grant of a new trial. The bases for the latter motion were alleged errors in the failure to admit the proffered exhibits and an alleged error in failing to charge the jury on the issue of sexual favoritism. Cushman, in turn, has renewed its motion for judgment as a matter of law with respect to Bartniak's hostile working environment claim, or, in the alternative, seeks a new trial. Cushman also renews its motion for summary judgment on the timeliness of Bartniak's EEOC charge. For the reasons which follow, Bartniak's motions are **DENIED**, and Cushman's motions are **DENIED** as moot.

## II. BACKGROUND

**A. Bartniak's Employment** History at Cushman

Cushman is a business in New York which, among other things, manages com-

mercial real estate in Manhattan. Trial Transcript ("Tr.") 235. Bartniak began working for Cushman in May 1990 as a temporary cleaning person at 235 East 42nd Street, a building managed by Cushman. Tr. 17–18. After a break in service, Bartniak returned to 235 East 42nd Street as a temporary cleaner, and then in May 1992 was placed into a permanent position at 219 East 42nd Street, another building managed by Cushman. Tr. 18. Both 235 East 42nd Street and 219 East 42nd Street were often collectively referred to as "the Pfizer Property." Tr. 18. During Bartniak's active employment with Cushman, Richard Parlatore ("Parlatore") was the property manager of the Pfizer Property. Agrelo was employed as the foreman at 219 East 42nd Street, and Nagi was employed as a porter at 219 East 42nd Street. Tr. 18.

## B. Bartniak's Allegations of Sexual Harassment

Bartniak testified[2] to the following actions as part of the pattern of sexual harassment at Cushman. According to Bartniak, Nagi often discussed having sex with her, touched her buttocks "a lot of times," and touched her breasts "four, five times." Tr. 25. She said that Nagi "often" asked her whether she knew what "sex" meant in English, and that he pointed to his crotch and told her that "his penis was very hard and very strong." Tr. 24. According to Bartniak, Nagi also told her that if she was willing to have sex with him, he would tell Anka Martinovic ("Martinovic"), a Cushman cleaning supervisor at the Pfizer Property, to give her more overtime. Tr. 24. On one occasion, Nagi took her hand and put it on his penis, Tr. 25, and on two occasions, he cornered her in a room with a garbage barrel, touched

her buttocks and her breasts, while zipping and unzipping his pants, and also pulled and pushed her apron. Tr. 24–31. Nagi also called her a "Polish bitch" on one occasion, Tr. 31, and Agrelo threatened to strangle her and also called her a "Russian bitch" on a number of occasions. Tr. 33.

Bartniak testified that Parlatore used to visit one of Bartniak's co-workers, Pashka Zadrima; that Parlatore and Zadrima would go into a room together on the sixth floor of 219 East 42nd Street; and that they required Bartniak to stand outside the door to make sure no one entered the room. Tr. 52, 56–57. Bartniak walked into the room on two occasions to discuss issues with Pashka Zadrima and on both occasions, Pashka was sitting on Parlatore's lap, her shirt was unbuttoned, and her face was red. Tr. 57–58. Bartniak was also required to punch Pashka's time card. Tr. 57. Pashka's employment was terminated in September 1992. Tr. 334.

## III. DISCUSSION

### A. Legal Standards for Rule 50.

■ A motion for judgment as a matter of law under Rule 50 should be granted only when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue." *See* Fed. R. Civ. P. 50(a)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001). In considering such a motion, the court should "review all of the evidence in the record" and "must draw all inferences in favor of the nonmoving party, and it may

---

2. The Court allowed Bartniak, who had limited facility with English, to testify through her own Polish interpreter, Lidia Rodak.

not make credibility determinations or weigh the evidence." *See Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

## B. Legal Standards for Rule 59.

Under Rule 59(a), a new trial may be granted following a jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *See* Fed R. Civ. P. 59(a). Ordinarily, a court should not grant a new trial "unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988). Unlike a judgment as a matter of law, a new trial may be granted under Rule 59 even if substantial evidence exists to support the jury's verdict. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992). Moreover, in considering a motion for a new trial, a court "is free to weigh the evidence . . . and need not view it in the light most favorable to the verdict winner." *Id.* (*quoting Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978)).

## C. Standards for Hostile Work Environment Claim under Title VII

### 1. Harassment by Supervisors

How a court analyzes a claim of sexual harassment against a company will depend on the status of the alleged harasser with respect to the complainant. In *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court affirmed that two types of sexual harassment by supervisors may violate Title VII: *quid pro quo* harassment, where the employee suffers a tangible negative employment action, such as discharge or demotion; and hostile en-

vironment harassment, where the employee does not experience a specific negative action, but the harassment is so pervasive that it changes the conditions of employment. Under this formulation, employers were held strictly liable for *quid pro quo* harassment. *See, e.g., Carrero v. New York City Hous. Auth.,* 890 F.2d 569 (2d Cir.1989).

In 1998, the Court clarified the analysis where the harassment is perpetrated by supervisors. While the employer is vicariously liable when there is a tangible employment action, where no tangible employment action is taken, the employer may raise an affirmative defense to liability or damages. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 760–761, 118 S.Ct. 2257. This affirmative defense has two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

### 2. Harassment by Non–Supervisors

When there is harassment by non-supervisory co-workers, the EEOC guidelines provide that:

> With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

29 C.F.R. § 1604.11(d); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 441 (2d Cir.1999); *see also Ferris v. Delta Air Lines, Inc.,* 277

F.3d 128, 136 (2d Cir.2001) (*citing Richardson*); *Faragher*, 524 U.S. at 799, 118 S.Ct. 2275 (noting that the circuits unanimously judge vicarious liability for co-worker harassment under a negligence standard). As this formulation makes clear, the trier of fact will be concerned with questions such as notice to the employer, steps taken by the employer to investigate, and actions taken with respect to the employees involved. As a practical matter, the major difference is that when a supervisor's actions are at issue, the employer has the burden of proving its affirmative defense under *Faragher/Ellerth*, whereas when a non-supervisor is involved, the burden falls to the plaintiff to prove that the employer did not take reasonable steps to address the situation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1180 (2d Cir.1996) (*citing Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992)).

## D. Application of Law to This Case

Because Bartniak had argued that Nagi had some supervisory functions, the jury was presented with the issue of whether the alleged harassment was by a supervisory employee. Although the jury answered this question in the negative, both Bartniak and Cushman have couched their arguments in the context of a *Faragher/Ellerth* analysis.

Bartniak argues that Cushman failed to meet the first prong of the *Faragher/Ellerth* test because it did not seriously investigate or act promptly to correct the harassing behavior and maintains that Cushman should have taken steps to transfer the alleged harasser. She further argues that she did not unreasonably fail to take advantage of remedial measures because the only option offered to her, moving to the adjoining building, did not remove her from the harassing environment.

Cushman argues that it had a detailed sexual harassment policy which was widely publicized and disseminated, that it afforded Bartniak a full opportunity to make complaints, and that she unreasonably failed to take advantage of preventative opportunities provided to her. Specifically, Cushman maintains that Bartniak first complained of sexual harassment in August 1993 and that it took immediate steps to address the allegations.

As discussed above, *Faragher/Ellerth* does not apply to this case. When a hostile working environment is created by a co-worker, the employer is not subject to strict liability and there is no need to consider an affirmative defense. This is not to say that the questions asked in a *Faragher/Ellerth* analysis are irrelevant in a co-worker case. Even when a supervisor is not involved, the trier of fact has an interest in exploring what steps were taken to remedy the alleged discrimination. The difference is that while Bartniak argues that Cushman did not meet it burden of proving an affirmative defense, the correct inquiry is whether Bartniak carried her burden to show that Cushman did not act reasonably. Thus, for Bartniak to prevail on her Rule 50 motion, she must demonstrate that, as a matter of law, Cushman acted unreasonably.

█ In support of its affirmative defense, Cushman presented the testimony of Grace Ben–Ezra ("Ben–Ezra"), Employee Relations Manager of the Human Resources Department. Ben–Ezra testified that between 1990 and 1993, Cushman had a policy regarding sexual harassment and that she, as human resources manager, had a role in enforcing the policy and ensuring that employees were aware of the policy. Tr. 327–28. She stated that the policy was disseminated to all employees as new hires and was also distributed to unionized employees. Tr. 328, 330–331.

Ben–Ezra testified to two meetings with Bartniak concerning problems Bartniak was having in the workplace.

### 1. The April 30, 1993 Meeting

On April 30, 1993, Bartniak contacted Ben–Ezra to complain about a number of workplace issues. She went to Ben–Ezra's office along with Rodak. Tr. 333–334. Ben–Ezra did not object to Rodak's presence at the meeting. Tr. 334. Bartniak told Ben–Ezra that she saw Agrelo going through a desk drawer in one of the offices which she cleaned and when she asked him what he was doing, he told her that he was checking her work. Tr. 334. Bartniak became nervous because his face was red and she believed he smelled of alcohol. Bartniak also told Ben–Ezra that Agrelo used foul language.

Bartniak also complained that Parlatore had shown favoritism towards Pashka Zadrima. Tr. 334. Finally, Bartniak told Ben–Ezra that she was upset about the floor on which she was working, but declined an offer to change her floor. Tr. 338–39. The meeting lasted about two hours, and Ben–Ezra allowed Bartniak to say everything she wanted to say. Ben–Ezra took several pages of detailed notes during the meeting. Tr. 337–39; Exh. 7. At this meeting, Bartniak did not mention Nagi's name nor did she state that any employee had made sexual propositions towards her or had touched her inappropriately. Tr. 340–41. Bartniak also made no mention of sexual activity between Parlatore and Pashka Zadrima on company premises. Exh. 7.

After the meeting, Ben–Ezra notified her supervisor, Carolyn Sessa ("Sessa"), then the Director of Human Resources, and the Human Resources Department conducted an investigation. Ben–Ezra discussed these complaints with Thomas Piazza ("Piazza"), Cushman's Portfolio Manager for the Pfizer Properties, John Santora ("Santora"), Piazza's supervisor, Parlatore, and James Whelan ("Whelan"), the Assistant Property Manager, as well as the legal department. Tr. 343–344. Nora Perez ("Perez"), the foreperson at 235 East 42nd Street, was also questioned. While no wrongdoing could be concluded, Santora met with Agrelo and Parlatore and warned them against favoritism and drinking on the job and also warned them against retaliating against Bartniak for making these complaints. Tr. 347–349. The warning was memorialized in writing and placed in both of their personnel files. Tr. 347–349; Exh. 115.

### 2. The August 10, 1993 Meeting

On August 10, 1993, Ben–Ezra had a second two-hour meeting with Bartniak and Rodak. Ben–Ezra again allowed Bartniak to say whatever she wanted to say and again took several pages of notes at the meeting. Tr. 346–347. During this meeting, Barniak complained that Nagi propositioned her for sex and touched her inappropriately. Immediately after being notified of Bartniak's sexual harassment complaint against Nagi, Cushman offered Bartniak a transfer to a different building, 235 East 42nd Street, at the same rate of pay, hours and other terms and conditions of employment, but Bartniak declined. Tr. 349–352.

The Human Resources Department investigated Bartniak's complaint. Ben–Ezra again consulted Sessa, Santora, Piazza, Parlatore and Whelan. Tr. 355–56. Nagi was interviewed by Ben–Ezra as well as individuals from building management. Tr. 353–56; Exhs. 2, 5, 6 and E. He denied the allegations made against him. Tr. 355; Exhs. 2, 5, 6. E. Perez was' also interviewed by Ben–Ezra and she told Ben–Ezra that she never witnessed any inappropriate behavior. Tr. 360; Exh. 3. A few days after Bartniak complained to

Ben–Ezra, she went out on a permanent leave of absence. Tr. 356. While she was out on a leave, Cushman continued to investigate over the course of several weeks. However, Bartniak's allegations could not be substantiated. Exhs. 2 and 117. Soon after Bartniak left the workplace, Ben–Ezra received a letter from an attorney on Bartniak's behalf. Company policy required Ben–Ezra to turn the matter over to Cushman's legal department at that point. Nancy Vary ("Vary") from the legal department reported to Bartniak's legal representative the results of the investigation, and renewed the transfer offer. Tr. 362–363; Exh. 117. Bartniak was also notified that Nagi was on an extended leave of absence and would not be back to work for several months, if at all. Exh. 117. Vary also explained to Bartniak's legal representative that if Bartniak returned to her former site, and Nagi also returned, Cushman would keep them apart. Exh. 117. Bartniak refused to return to work, and had not returned to the job as of the date of trial.

### 3. Bartniak's Arguments

With respect to the first meeting, Bartniak argues that "there was insufficient evidence to prove that Cushman & Wakefield seriously investigated and acted promptly to correct the harassing behavior." Plaintiff's Memorandum of Law in Support of Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial ("Pl.Memo"), at 4. She, however, fails to support this position. She presented testimony that Parlatore had shown *sexual* favoritism toward Pashka Zadrima. Tr. 58, 66–67. She also presented testimony that Ben–Ezra was informed that Nagi was sexually harassing her, Tr. 285–86, and had attacked her. Tr. 66. While this testimony supports her contention that Cushman knew of the alleged sexual harassment, and did not act to address the problem, Bartniak cannot meet her burden

simply by showing that there was testimony which contradicted Ben–Ezra. The jury was free to disregard the testimony of her witnesses, in whole or in part.

Bartniak's main complaint with this second meeting appears to be that Cushman did not offer her a workable solution:

> However, Ben–Ezra never made inquiries to the union about transferring plaintiff to one of Cushman & Wakefield's 30 to 40 other properties in midtown Manhattan, and only knew of a transfer offer to 235. During its investigation into the allegations made in plaintiff's August complaint, Cushman & Wakefield did not require Nagi to take a leave of absence, nor did they require him to change his hours. Ben–Ezra testified that she recalled Nagi telling her that he had been coming in "a bit earlier" than Bartniak in order to avoid meeting with her, but there was no evidence offered that Cushman & Wakefield asked Nagi to change his shift or considered transferring him to another building during the investigation. (record citations omitted)

Pl. Memo at 5–6. This recitation of possible actions by Cushman is plainly inadequate to demonstrate that Cushman acted unreasonably, or to question the jury's verdict. Indeed, the Court finds that, even though not required in this case, there was ample evidence to support the jury's finding that Cushman had established an affirmative defense under *Faragher/Ellerth.*

### E. Appropriateness of a Charge of Sexual Favoritism.

██ At the close of the evidence, Bartniak requested that the Court give the jury a charge on the issue of sexual favoritism. For this position, she relies on certain policies and guidelines by the EEOC. This reliance is misplaced. While a charge of sexual favoritism may be appropriate in

some circumstances, neither the evidence nor the case law cited by plaintiff supports such a charge in this case.

The EEOC defines sexual favoritism as:

Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit.

29 C.F.R. § 1604.11(g). The Commission has also promulgated a Policy Guidance on Employer Liability under Title VII for Sexual Favoritism. No. N–915.048 (approved Jan. 12, 1990) ("EEOC Policy Guidance"). The guidelines set forth three kinds of situations: (1) isolated instances of favoritism towards a "paramour"; (2) favoritism based upon coerced sexual conduct; and (3) widespread sexual favoritism. In her brief, plaintiff relies on an example from the third category of favoritism:

CP's [Charging Party's] supervisor and other management personnel regularly solicited sexual favors from subordinate employees and offered job opportunities to those who complied. Some of those employees willingly consented to the sexual requests and in turn received promotions and awards. Others consented because they recognized that their opportunities for advancement would otherwise be limited. CP, who did not welcome this conduct, was not approached for sexual favors. However, she and other female and male coworkers may be able to establish that the conduct created a hostile work environment. She can also claim that by their conduct, the managers communicated to all female employees that they can obtain job benefits only by acquiescing in sexual conduct.

EEOC Policy Guidance, § C. Plaintiff focuses on the wrong category. Widespread favoritism refers to an environment where multiple supervisors are engaging in this behavior such that "a message is implicitly conveyed that the managers view women as 'sexual playthings,' thereby creating an atmosphere that is demeaning to women." *Id.,* § C. At best, Bartniak has presented evidence of a paramour. The guidelines make clear that this conduct is not prohibited by Title VII. The Second Circuit agrees. In *DeCintio v. Westchester County Medical Center,* 807 F.2d 304 (2d Cir. 1986), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), male respiratory therapists claimed that they were denied a promotion that went to a woman romantically involved with the department administrator. The Court held that the conduct was unfair, but did not violate Title VII:

Ryan's conduct, although unfair, simply did not violate Title VII. Appellees were not prejudiced because of their status as males; rather, they were discriminated against because Ryan preferred his paramour. Appellees faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but Guagenti could be considered for the appointment because of Guagenti's special relationship to Ryan. That relationship forms the basis of appellees' sex discrimination claims. Appellees' proffered interpretation of Title VII prohibitions against sex discrimination would involve the EEOC and federal courts in the policing of intimate relationships. Such a course, founded on a distortion of the meaning of the word "sex" in the context of Title VII, is both impracticable and unwarranted.

*Id.* at 308.

## F. Admissibility of Excluded Exhibits

Plaintiff complains about three exhibits excluded by the Court, which she claims

were relevant to her claim of a hostile work environment: (1) an undated anonymous letter enclosing a nude photograph (Exh. 13, not admitted); (2) an anonymous letter received by defendant on April 16, 1992 (Exh. 12, not admitted); and (3) an anonymous letter received by defendant on August 20, 1992. Exh. 14, not admitted. Each of these letters related to Richard Parlatore in some manner.

### 1. Undated Letter with Photograph

■ Although plaintiff argued that this exhibit provided evidence of inappropriate behavior on the part of Richard Parlatore, the focus of the discussions concerned the picture attached to the letter. This picture consisted of a frontal nude shot of a female with her legs spread. According to plaintiff, this exhibit demonstrated that Cushman was aware that Parlatore was having a sexual relationship with a former employee while plaintiff was employed. The Court found that the letter was not relevant to any claim in the case. The picture was not shown in the workplace. The plaintiff had not seen it and did not offer any testimony that it had contributed to the alleged hostile environment. Moreover, the Court concluded that, even if there was any relevance to the picture, it was excludable under Rule 403, Federal Rules of Evidence, because its explicitness would only inflame the jury.

### 2. April 1992 and August 1992 Letters

These letters were received by Cushman while Bartniak was employed, and Bartniak argued that they were relevant in showing that Cushman was aware that Parlatore was engaged in sexual conduct in the workplace. The Court indicated to Bartniak that she would have to lay a foundation why conduct by Parlatore was relevant to her claim of hostile environment. Bartniak failed to provide such a foundation through any admissible testimony. Plaintiff's only attempt to justify

these exhibits was an argument that the letters supported a allegation of sexual favoritism. As discussed above, sexual favoritism by a single supervisor is inadequate to make out a claim under Title VII.

In sum, plaintiff failed to demonstrate that these exhibits were relevant. To the extent there was any limited relevance, the exhibits would have unnecessarily inflamed the jury, and on balance should not have been admitted. Finally, even if the exhibits were erroneously excluded, this exclusion would not provide a basis for granting plaintiff a new trial.

## IV. CONCLUSION

Bartniak's motion to strike Cushman's affirmative defense as a matter of law is **DENIED**. Not only was there ample evidence to support such a defense if necessary, but the Court finds that Cushman did not have the burden of proving an affirmative defense. Bartniak's motion for a new trial is **DENIED**. There was no justification for a charge of sexual favoritism, and Bartniak has failed to demonstrate any error in excluding the proffered exhibits. Her claims were properly dismissed by the jury.

The motions by Cushman are **DENIED** as moot.

The Clerk of the Court is directed to enter judgment for defendant Cushman & Wakefield, Inc.