Starr **DAWSON**, Deborah Johnson, Deborah MacDonald, Pauline Deans, Deloris Cherry Velma Lee and Millicent McFarlane, Plaintiffs,

v.

**COUNTY OF WESTCHESTER**, William DeCuiceis, as the Warden of Westchester County Department of Corrections and Individually, Phillip Banks, as Sergeant and as a supervising employee of the County of Westchester and Individually, Rocco Pozzi, Commissioner of Corrections for the County of Westchester, Joseph Miranda, Chief of Operations, Department of Corrections, Robert L. Davis, Deputy Commissioner, Department of Corrections, County of Westchester, Defendants.

No. 01 CIV. 7218(WCC).

United States District Court,
S.D. New York.

Dec. 29, 2004.

---

**13.** This withdrawn argument is the same one Armstrong made at pp. 2–3 and 9–10 of the instant petition.

Joseph A. Maria, P.C. (Frances Dapice Marinelli, Esq., Of Counsel), White Plains, NY, for Plaintiffs.

Charlene M. Indelicato, Westchester County Attorney (Jane Hogan Felix, Sr. Asst. County Attorney, Shannon S. Brady, Asst. County Attorney, Of Counsel), White Plains, NY, for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Starr Dawson, Deborah Johnson, Deborah MacDonald, Pauline Deans, Deloris Cherry, Velma Lee and Millicent McFarlane (collectively "plaintiffs") brought this action against defendants County of Westchester (the "County") and the following personnel of the Westchester County Department of Corrections (the "Department"):[1] (1) Sergeant Phillip Banks; (2) Commissioner Rocco Pozzi; (3) Chief of Operations Joseph Miranda; (4) Warden William DeCuiceis;[2] and (5) Deputy Commissioner Robert L. Davis,[3] alleging violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e)), the First, Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, § 45-c of the New York Civil Rights Law[4] and § 296 of the New York Executive Law. Defendants have moved for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons stated hereinafter, we grant the summary judgment motions of defendants Pozzi and Miranda in their entirety. The motions for summary judgment of the County and defendant Banks are granted in part and denied in part.

## BACKGROUND

### I. Plaintiffs' Factual Allegations

In October of 1999, all plaintiffs were Correction Officers ("COs" or "CO") for the Department except for Johnson who was a Sergeant. (Defs. Rule 56.1 Stmt. ¶ 1.) During that time, the County had a policy against sexual harassment, which applied to the Department. (Id. ¶ 4.) Plaintiffs and Banks attended training with respect to sexual harassment prior to October 1999. (Id. ¶ 23.)

### A. The Letters

In early October of 1999, two letters apparently written by inmates were found by personnel of the Department. The first letter contained a drawing and sexually explicit language that referred to numerous female COs, including the plaintiffs. (Defs. Mem. Supp. Summ. J. at 1.) On or about October 7, 1999, CO Kelly Reckard[5] showed the letter to Deans, the first plain-

---

1. All of the individual defendants are also sued in their individual capacity (the "individual defendants").

2. DeCuiceis has not been served in this case and has not appeared.

3. Davis has also not been served in this case and has not appeared.

4. The Court again notes that there is no § 45-c of the New York Civil Rights Law and assume plaintiffs meant § 40-c. See McKinney's Civil Rights Law § 40-c.

5. Reckard, who is also named in the letter but is not a plaintiff, became aware of the letter after observing COs Shelton, Casablanca, Holmes and Sgt. Martinez reading it. (Pls. Mem. Opp. Summ. J. at 2.)

tiff to become aware of its existence.[6] (Defs. Rule 56.1 Stmt. ¶ 5.) Deans showed the letter to MacDonald who made a copy and brought it to Johnson. (*Id.*) MacDonald and Johnson reported the letter to Warden DeCuiceis the same day. (*Id.* ¶ 7.) Sometime later, MacDonald showed the letter to Dawson, Cherry and McFarlane. (*Id.* ¶ 6.)

The second letter, which also contained explicit sexual language referring to specific COs, including plaintiffs, was found by CO Donna Alford. (Defs. Mem. Supp. Summ. J. at 2.) On October 8, 1999, Alford showed Deans the second letter in the presence of Banks. Banks became aware of the letters through rumors that day, but did not actually see the letters until Deans showed them to him. (Defs. Rule 56.1 Stmt. ¶ 8.) Deans made a copy of each letter for Banks. (Defs. Mem. Supp. Summ. J. at 2–3.) Banks told Deans he would try to help identify the writer of the letters and, if the writer was an inmate, transfer that inmate to the old jail. (Banks Dep. at 73.) Banks never reported the letters to his captain or the warden. (Pls. Mem. Opp. Summ. J. at 3.) Deans later showed the second letter to Johnson who reported it to DeCuiceis on an unspecified date. (Johnson Dep. at 52, 59.)

Lee did not find out about the letters until she returned from vacation on October 11, 1999. (Lee Dep. at 8.) According to Lee, upon entering the Westchester County Correctional Facility (the "Correctional Facility"), she saw Banks and CO Norman Bush standing together and she observed Banks giving Bush a piece of paper. (*Id.* at 9.) When Lee asked to see the piece of paper, Bush was hesitant to show it to her. Lee claims Banks said, "You made the top 15." (Pls. Mem. Opp. Summ. J. at 5.) Banks encouraged Bush to show Lee the letter but asked Lee, "Do you have your sense of humor with you today?" (*Id.*, Ex. 25.) Lee was given the letter, read it and walked away. (*Id.*) As she was walking away, Lee claims Banks said to her, "At least yours was the mildest of them all." (*Id.*) Later, MacDonald showed Lee both letters. (*Id.*) Lee reported the incident with Banks to CO Scott Delfa, a union representative, who spoke to Cpt. Soychek. (*Id.* at 5.) The only other statements Lee claims Banks made to her were "How are you Miss Lee" and "Everything all right with you today, Miss Lee?" (Lee Dep. 43.) These interactions occurred in early November of 1999. (*Id.* at 42.)

According to Banks, he showed Lee the letter first and asked if it was okay to show it to Bush, whereupon Lee responded that she did not care. (Banks Dep. at 87.) At that point Bush read the letter. Banks denies making the statement "You made the top 15" and the comment about the mildness of the reference to Lee, but does acknowledge telling Lee that she had to have a sense of humor to read the letter. (*Id.* at 88.)

According to Cherry, on October 11, 1999, while she was eating lunch in the mess hall, Banks and Sgt. Sheridan Reynolds sat down with her. (Pls.Mem.Opp.Summ. J., Ex. 23.) CO Middleton came into the mess hall and yelled to Banks, "Show me that letter, man." (*Id.*) Banks placed one of the letters on the table for Middleton to read and Cherry said to Banks, "I know what you're

---

**6.** There is testimony from CO Joseph Young that at least one of the letters was already being circulated as early as October 1, 1999. He observed several copies of the letter on a desk in the main core and in the briefing room where supervisors report for assignments each day. He observed other COs "picking up the papers, reading them, then throwing them in the garbage." (Pls. Mem. Opp. Summ. J., Ex. 15; Banks Dep. at 26.)

doing." (*Id.*) Cherry further testified that she had seen the letter before this incident but was unaware that Banks had a copy of it. (Cherry Dep. at 26.) She later reported this incident to Johnson. (Pls.Mem.Opp.Summ. J., Ex. 23.) Cherry further alleges that on several occasions Banks stopped and stared at her. (Cherry Dep. at 40.)

Banks' version of the incident is much different. He claims while having lunch with Cherry, he told her that he hoped that the letters were not getting her down. (Banks Dep. at 97.) He claims that Cherry said something to the effect that the letter was a lie and that her breasts were not small as she cupped them with her hands. (*Id.*) Banks claims everyone laughed and Cherry walked away. (*Id.*)

McFarlane also claims to have had an offensive incident with Banks and apparently witnessed him giving other COs a copy of one of the letters. On approximately October 11, 1999, McFarlane was in the control area, often referred to as the "bubble," and Banks showed her a copy of the first letter. (McFarlane Dep. at 10.) She claims Banks and other unidentified COs were there and that the letter was "being circulated." (*Id.* at 12.) The manner in which the letter was being circulated, as described by McFarlane, is unclear:

Q: When you say the letter was being circulated, what do you mean by that?

A: Like— I can't remember exactly who was with him, but then, you know, they had different copies of the same letter.

Q: Did you see him giving copies to other people?

A: Officers. I don't know exactly which officer that was.

Q: You don't know any of the officers that you saw him hand it to?

A: (No verbal response.)

Q: How do you know that it was this letter that he was giving to the other officers?

A: Because the picture that's on the letter, okay, as opposed to reading exactly what it said.

Q: Did he give you a copy or did someone else give you a copy?

A: (No verbal response.)

(*Id.* at 12–13.)

On October 9, 1999, McFarlane was in the mess hall eating lunch with Banks and Reynolds. (McFarlane Dep. at 19; Pls. Mem. Opp. Summ. J., Ex. 24.) According to McFarlane, Banks asked her, "What other body parts do you have pierced?," referring to the sexually explicit letters. (McFarlane Dep. at 20; Pls. Mem. Opp. Summ. J., Ex. 24.) McFarlane responded, "I find this line of conversation offensive and I wish you to stop." (*Id.*) She made the same statement again to Banks when he again commented on her piercings. (*Id.*) Reynolds then told Banks to back off because McFarlane had complained about comments made by another CO before. (*Id.*) McFarlane complained to a sergeant about Banks' behavior and made a statement to the Special Investigative Unit ("SIU"). (McFarlane Dep. at 24.)

According to Banks, the comment he made to McFarlane at lunch was, "Millicent, don't you think that's excessive? What are you trying to do, cover your entire body with piercing jewelry?" (Banks Dep. at 101.)[7]

7. A statement given by CO Reynolds is similar to Banks' version of the incidents involving Banks, Cherry and McFarlane and a statement by a cafeteria worker, Doritt Bhola, regarding the incident between Banks and

On October 11, 1999, CO R. Hittman, not a party to this action, claims that Banks showed him one of the letters. (Pls.Mem.Opp.Summ. J., Ex. 26.) Hittman reported this to Johnson and made a statement to the SIU. (*Id.*) Banks denies showing Hittman the letter. (Banks Dep. at 91.)

Also on October 11, 1999, CO Vernice Collins, also mentioned in the letters but not a party to this action, saw Banks as she arrived to work and he said to her, "You made the top 15 list." (Pls.Mem.Opp.Summ. J., Ex. 35.) Collins did not know what that meant and Banks told her he would show the letters to her later. (*Id.*) When Collins saw Johnson later that day, Johnson showed her the letters and Collins mentioned Banks' comment. (*Id.*)

Around October 8, 1999, Dawson claims that Banks shouted at her down the hallway, "I want to show you something." (Dawson Dep. at 38.) She continued walking and did not see Banks again for him to show her anything. (*Id.*) She also claims Banks stared at her. (*Id.* at 39.)

Deans also claims to have been subjected to stares and comments by Banks. (Deans Dep. at 166–67.) Deans alleges that there were constant comments from other COs she could not identify such as, "When is your next day off, could we hook up?" and "I heard you suck a mean dick on your days off." (*Id.* at 50.) She also claims the inmates were disrespectful after the letters surfaced. (*Id.* at 51.)

Johnson claims to have felt harassed by the very presence of Banks. (Johnson Dep. at 128.) Johnson felt it was very difficult to perform her duties and that the workplace became intolerable due to the embarrassment and humiliation caused by the circulation of the letters. (*Id.* at 170.)

She also felt betrayed that the County did nothing about it. (*Id.*) Further, she claims that other supervisors subjected her to silent treatment. (*Id.* at 171.)

MacDonald claims to have been subject to silent treatment, isolation, stares and nasty looks by Banks and other COs. (MacDonald Dep. at 31.) Also, a male CO told MacDonald that other male COs wanted him to tell the women who were complaining about Banks to back off of him. (*Id.* at 59–60.)

On October 11, 1999, the plaintiffs along with other COs made a formal written complaint to DeCuiceis, which they all signed. (Defs. Rule 56.1 Stmt. ¶ 11.) On approximately October 12, 1999, DeCuiceis submitted a written request for Special Investigation to Pozzi, which was authorized on approximately the same date. (*Id.* ¶ 12; Pozzi Dep. at 24.) The SIU interviewed all plaintiffs and at least eleven other officers, supervisors and civilian staff. (Defs. Rule 56.1 Stmt. ¶ 14.) SIU reported its findings to Anthony Czarnecki, Special Assistant to the Commissioner, who submitted a report with recommendations to Pozzi around November 23, 1999. (*Id.* ¶¶ 14, 15.) In his report, Czarnecki informed Pozzi that "it appeared that Sgt. Banks failed to report the slanderous letter to a higher-ranking authority, failed to conduct any credible investigations about its authorship or circulation, engaged in inappropriate conversations with supervisors and officers about the contents/targets of the defamatory letter, and essentially abandoned his duties as a supervisor." (Pls. Mem. Opp. Summ. J., Ex. 70 at 1.)

After a discussion with his staff, Pozzi requested two additional interviews. (Czarnecki Dep. at 137, 146.) A second report by SIU was submitted and Czar-

McFarlane is also similar to Banks' version.

(Pls. Mem. Opp. Summ. J., Ex. 70 at 4.)

necki prepared a follow-up report with recommendations for Pozzi. (Defs. Rule 56.1 Stmt. ¶ 16.) Pozzi then ordered that Banks be formally counseled for not bringing the letters to the attention of a higher authority and attempting to conduct an investigation on his own. (Pozzi Dep. 53–54.) After formal counseling, Banks was transferred to the penitentiary in June of 2000. (Banks Dep. at 167.)

## II. *Procedural History*

This action was commenced in August 2001. Defendants subsequently moved for summary judgment. In an Opinion and Order dated July 25, 2003, this Court granted summary judgment to defendants on all of plaintiffs' federal claims, and declined to exercise pendent jurisdiction over plaintiffs' state law claims.

Thereafter, plaintiffs appealed this Court's decision granting defendants summary judgment. The Second Circuit affirmed the dismissal of plaintiffs' Title VII and Section 1983 retaliation claims, but vacated the part of this Court's opinion granting summary judgment on plaintiffs' hostile work environment claims under Title VII and Section 1983. Additionally, the Second Circuit reinstated plaintiffs' state law claims. Subsequently, defendants moved for summary judgment, which is the motion presently before this Court.

## DISCUSSION

In compliance with Local Rule 56.1(a), defendants have annexed to their summary judgment motion a separate statement of material facts as to which they contend there are no genuine issues of material fact to be tried. Plaintiffs have failed to respond with a corresponding statement of material facts controverting defendants' statement to demonstrate that there exists a genuine issue, as required by Local Rule 56.1(b). Thus, pursuant to Local Rule 56.1(c), all material facts set forth in the statement provided by the defendants are deemed admitted for purposes of this motion because they have not been controverted by a statement of plaintiffs. *See* Local Rule 56.1(c) (providing in relevant part, "[e]ach numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party"); *see also Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 1 (2d Cir.1998); *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F.Supp.2d 689, 693 (S.D.N.Y.2003).

## I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in her favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. *Hostile Work Environment Claims Under Title VII*

 Title VII requires employers to provide an atmosphere free of sexual abuse or hostility. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to succeed on a hostile work environment claim, the plaintiff must show that the workplace was so ridden "with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The victim must not only perceive the environment as hostile, but the environment must be such that a reasonable employee in the person's shoes would perceive it as hostile. *Id.* at 21–22, 114 S.Ct. 367; *Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997). In addition, a plaintiff must also show that there is a specific basis for imputing the offensive conduct to the employer. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

 "Whether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances." *Carrero v. N.Y. City Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989).[8] The Supreme Court has provided guidance and established a non-exclusive list of factors that should be weighed when considering the totality of circumstances in determining whether a workplace is permeated with discrimination. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. These factors include: (1) the frequency and severity of the conduct; (2) whether the conduct was physically threatening, humiliating or merely an offensive utterance; (3) whether it unreasonably interferes with the employee's job performance; and (4) the effect on the employee's psychological well-being. *Id.; see also Kodengada v. Int'l Bus. Machs. Corp.,* 88 F.Supp.2d 236, 242 (S.D.N.Y.2000) (citing *Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir. 1999)). Although one encounter may constitute a hostile work environment, conduct that can be characterized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986).

This Court previously determined that plaintiffs subjectively felt there was a hostile work environment, but that the harassment was "not sufficiently severe or pervasive to alter the conditions of the plaintiffs' employment and create an abusive work environment." *Dawson v. County of Westchester,* 274 F.Supp.2d 364, 375 (S.D.N.Y. 2003) (Conner, J.). However, the Second Circuit disagreed and found that plaintiffs' evidence of hostile work environment was

---

8. "[T]he crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

sufficient to survive summary judgment. *See generally Dawson v. County of Westchester*, 373 F.3d 265 (2d Cir.2004).

The Second Circuit articulated the crucial question as being "whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace." *Dawson*, 373 F.3d at 274. The court explained,

> [i]ndeed, in the prison context especially, officers must depend upon their co-workers for mutual protection and rely upon them for their own ability to assert authority over others in potentially dangerous situations. In such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety or compromise her capacity to command respect and obtain compliance from co-workers, subordinates, and inmates assume greater, not lesser significance.

*Id.* at 273. Accordingly, the Second Circuit concluded that it was "improper to grant summary judgment to all defendants on the grounds that plaintiffs failed to put forth evidence of an actionable hostile work environment," however, the court also noted that "it may be that certain defendants can establish nonliability as a matter of law on some or all of the plaintiffs' legal theories." *Id.* at 275. Consequently, the County and the individual defendants renewed their motion for summary judgment, which we will now consider.

**A.** ***Liability of the County Under Title VII***

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e(a)(1). Not only must a plaintiff present evidence from which a trier of fact could conclude that " 'the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment,' " but the plaintiff must also show that " 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.' " *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.2003) (quoting *Richardson v. N.Y. State Dep't of Corr. Service*, 180 F.3d 426, 436 (2d Cir.1999) (citations and internal punctuation omitted)). Since the Second Circuit concluded that plaintiffs have presented sufficient evidence of a hostile work environment to survive summary judgment, the central inquiry which we must now consider is whether defendants are liable for the hostile work environment.

■■ An employer is liable for an employee's actions when the employee acts within the scope of employment, but even where an employee is not acting within the scope of employment, an employer may have vicarious liability when a supervisor creates a hostile work environment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment," scope of employment is not the only basis on which to impute liability to an employer under agency principles. *Id.* at 757, 118 S.Ct. 2257. The Supreme Court referred to the Restatement to aid in the determination of whether agency principles impose liability on employers even where employees commit torts outside the scope of employment. The relevant Restatement principles are as follows:

> "(2) A master is not subject to liability for the torts of his servants acting out-

side the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

*Id.* at 758, 118 S.Ct. 2257 (quoting RESTATEMENT (SECOND) OF AGENCY § 219(2) (1957)). Upon exploring these principles, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 765, 118 S.Ct. 2257. However, employers are not vicariously liable for the actions of a mere co-worker that create a hostile work environment unless the plaintiff can show that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atl.,* 385 F.3d 210, 225 (2d Cir.2004) (citing *Faragher,* 524 U.S. at 789, 118 S.Ct. 2275); *see also Mack,* 326 F.3d at 123. The rationale is that "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control."

*Mack,* 326 F.3d at 124 (quoting *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257).

Nonetheless, the Supreme Court recognized that if no tangible employment action was taken an employer may have an affirmative defense to liability or damages available. *Id.* at 765, 118 S.Ct. 2257. However, "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," an employer is not entitled to any affirmative defense and will be held strictly liable for the supervisor's harassment. *Id.; see also Pa. State Police v. Suders,* —— U.S. ——, ——, 124 S.Ct. 2342, 2349, 159 L.Ed.2d 204 (2004). The affirmative defense to liability or damages that may be available to an employer when no tangible employment action is taken requires the employer to prove two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." [9] *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

Consequently, whether the County is vicariously liable will turn on whether Banks, the alleged harasser, was in a supervisory position. In *Mack,* the Second Circuit looked to the Equal Employment Opportunity Commission ("EEOC") enforcement guidelines for guidance and found the Enforcement Guidelines on Vicarious Employer Liability for Unlawful Harassment by Supervisors (the "Guidelines") to be "persuasive." 326 F.3d at 127. The Guidelines suggest that "[a]n individual qualifies as an employee's 'su-

---

**9.** An employer's affirmative defense to liability or damages in a Title VII hostile work environment claim is subject to proof by a preponderance of evidence. *See id.* (citing FED. R. CIV. P. 8(c)).

pervisor' [for purposes of Title VII liability] if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or (b) [t]he individual has authority to direct the employee's daily work activities." *Id.* (concluding that the authority that renders a person a supervisor for purposes of Title VII analysis is broader than the mere power to hire, fire, demote, promote, transfer or discipline another employee) (citations omitted). Additionally, the court explained that the appropriate question to consider in determining whether an employee was acting in a supervisory capacity is "whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates." *Id.* at 126.

▊ Plaintiffs contend that Banks was their supervisor at the Correctional Facility, and that the County is vicariously liable for his behavior. Plaintiffs argue that Banks was a supervisor within the meaning of Title VII because "[h]e was a sergeant and next in the chain of command to which plaintiff correction officers reported." (Pls. Mem. Opp. Summ. J. at 19.) Plaintiffs, upon learning of the letters, gave copies of them to Banks, so that he could look into finding the author of the letters and take the necessary actions on the plaintiffs' behalf. (Pls. Mem. Opp. Summ. J., Ex. 70 at 2–3.) However, Banks did not take any steps to investigate matters related to the letters, nor did he notify his superiors. (*Id.*) In fact, Czarnecki's report to the Commissioner concluded "[i]f anything, he just continued to show them to other people creating an atmosphere of distrust and frustration to the women described in the letters. . . .

Many described his conduct with these letters as 'offensive,' 'humiliating,' 'inappropriate' and 'unbecoming a supervisor.' " (*Id.* at 5.) Additionally, plaintiffs draw attention to the fact that "[t]he Second Circuit noted that defendant's Special Assistant, Anthony Czarnecki, found that Banks sexually harassed plaintiffs and 'essentially abandoned his duties as a supervisor.' " (Pls. Mem. Opp. Summ. J. at 19.) Further, the Second Circuit recognized that Banks was in a supervisory position in its statement that "[t]he harassment alleged by plaintiffs emanated from a variety of sources, including co-workers *as well as at least one individual in a supervisory position (Sgt.Banks).*" *Dawson,* 373 F.3d at 275 (emphasis added).

Conversely, the County denies that Banks was plaintiffs' supervisor. Defendants contend that Banks cannot be a supervisor because he had "no authority to hire, fire, transfer, or take other tangible employment actions against plaintiffs. . . . Banks could not alter plaintiffs' work schedules, nor could he take any action that would affect their employment benefits." (Defs. Mem. Supp. Summ. J. at 12–13.) According to defendants, "[o]nly Pozzi, as the appointing authority, may hire, fire, or formally discipline correction staff. An exception exists for a negotiated alternative disciplinary procedure for minor infractions for ·Correction Officers, during which the Associate or Assistant Warden makes the final determination for alternative discipline." (Defs. Rule 56.1 Stmt. ¶ 41.) Additionally, defendants assert that because Banks was a sergeant, the second lowest rank at the department,[10] he cannot be deemed a supervisor. In sum, defendants allege that because Banks "had no power to alter the terms and conditions of

---

**10.** "Above Banks [as a Sergeant] in the chain of command are: Captains, Assistant Wardens, Associate Wardens, Deputy Commissioner(s), and the Commissioner." (Defs. Mem. Supp. Summ. J. at 13.)

plaintiff's employment," he is not a supervisor within the Title VII context.

The Second Circuit has made clear that "the authority that renders a person a supervisor for purposes of Title VII analysis is broader than that reflected in the *Parkins* test" which defined supervisory status as the " 'authority to affect the terms and conditions of the victim's employment'" such as " 'the power to hire, fire, demote, promote, transfer, or discipline an employee.'" *Mack*, 326 F.3d at 126 (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027 (7th Cir.1998)). Consequently, notwithstanding defendants' arguments, we conclude that Banks was plaintiffs' supervisor for purposes of imputing liability to the County, and that the County may be held vicariously liable for Banks' actions that violate Title VII. Banks may not have had the authority to undertake or recommend tangible employment actions against plaintiffs or the authority to direct the plaintiffs' daily work activities, as "supervisor" was defined by the EEOC, but the Second Circuit found this test described by the EEOC to be merely "persuasive," not controlling. As previously mentioned, the court stated that in making the determination of whether an employee is a supervisor for purposes of imputing liability to the employer, it is appropriate to consider whether the authority given to the employee by the employer "enabled or materially augmented the ability" of the employee to create a hostile work environment. *Mack*, 326 F.3d at 126. We rely in part on this statement in concluding that Banks was plaintiffs' supervisor.

In the case at bar, Banks' role as a sergeant did "enable or materially aug-

ment the ability" to create a hostile work environment. Plaintiffs reported the letters to him "because he was a supervisor, and he failed to report it in the chain of command."[11] We find persuasive plaintiffs' assertion that the County has delegated supervisory responsibility to sergeants (such as Banks) over COs, such as plaintiffs, as the first link in the chain of command. A reasonable jury could find that he was a supervisor and that he contributed to the creation of a hostile work environment by virtue of that status. *See Sullivan*, 281 F.Supp.2d at 706 (recognizing that if a trier of fact could conclude an employee was plaintiff's supervisor, or that she reasonably believed that he was, there may be a basis from which to impute vicarious liability to the employer); *see also Lumhoo v. Home Depot USA, Inc.*, 229 F.Supp.2d 121, 156–57 (E.D.N.Y.2002) (finding evidence sufficient to support a finding by a reasonable jury that employee was a supervisor so that employer could be held liable for harassing conduct even though employee did not have the power to fire, hire, demote or promote); *Smith v. City of Oklahoma City*, 64 Fed.Appx. 122, 126, 2003 WL 1870996, at *3 (10th Cir. 2003) (finding reversible error where district court concluded as a matter of law that police sergeant was not officer's supervisor and acknowledging that whether employee was a supervisor was a question to be submitted to the jury where record contained evidence of control). Accordingly, we find there is sufficient evidence in the record from which a trier of fact could conclude that Banks was plaintiffs' supervisor.

However, because Banks' harassment did not involve a tangible employment ac-

---

**11.** Rather than try to find out who authored the letters, or help the plaintiffs, Banks apparently did nothing except make the situation worse and create a hostile work environment by allegedly distributing copies of the letters to other COs and making unseemly comments to plaintiffs about them.

tion, the County cannot be held vicariously liable if it can establish the affirmative defense set forth in *Ellerth* and *Faragher*. That defense requires the employer to show that they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. "One way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place," however, that fact alone is not "necessarily dispositive." *Mack*, 326 F.3d at 128; *see also Petrosino*, 385 F.3d at 226.

■ Plaintiffs contend that there is a disputed issue of fact as to whether the steps taken by the County to investigate the author of the letters, Banks' handling of the letters and his alleged sexual harassment were reasonable and adequate. (Pls. Mem. Opp. Summ. J. at 19.) Summary judgment is not appropriate where clear factual issues exist as to whether a defendant, who had notice of a plaintiff's allegations of a hostile work environment, took reasonable steps to eradicate the harassment. *See Ramirez v. N.Y. Presbyterian Hosp.*, 129 F.Supp.2d 676, 681 (S.D.N.Y.2001) (citing *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995)).

Although defendants conducted an investigation, no action was taken by defendants to prevent the circulation of the letters, end Banks' alleged harassment or correct the hostile work environment until five months after plaintiffs' initial complaints. Notwithstanding the fact that the County and Department had a sexual harassment policy in place that provided that "1) the parties involved be conferred with and the facts of the allegation be examined individually ... and 2) that an employee who is found to have committed an act of sexual harassment may be subject to disciplinary action and termination," according to plaintiffs, neither Pozzi nor Czarnecki ever spoke to them about their complaints nor was Banks terminated or even formally disciplined after being "found to have committed an act of sexual harassment and to have contributed 'to a hostile work environment for female employees.'" (Pls. Mem. Opp. Summ. J. at 15) (internal quotations and citations omitted).) While a fact-finder could reasonably conclude that the County's responses were reasonable and adequate, we cannot say as a matter of law that the record evidence permits no other reasonable result. There exists a material issue of fact as to whether the defendants' response to plaintiffs' allegations of a hostile work environment was reasonable and prompt. Accordingly, summary judgment must be denied.

■ Moreover, even if plaintiffs were not able to establish vicarious liability, "an employer can also be liable for an employee's hostile work environment if the employee can establish that she was harassed by a fellow employee" and the County was negligent in that it "provided her [them] with no reasonable avenue of complaint or ... it knew of the harassment but did nothing about it."[12] *Sullivan*, 281 F.Supp.2d at 706 (citing *Richardson*, 180 F.3d at 441; *Quinn*, 159 F.3d at 766); *see also* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual

12. Additionally, as pointed out by defendants, this is the only means by which Johnson can assert a Title VII claim against the County, as she and Banks are of equal ranks.

harassment in the workplace where the employer ... knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."). An employer need not have actual knowledge of the harassment to be liable; rather, the employer is deemed to have notice of the harassment and is liable "when the employer or any of its agents or supervisory employees knew or should have known of the conduct." *Jasmin v. N.Y. State Dep't of Labor*, 1999 WL 1225249, at *3 (S.D.N.Y. Dec. 21, 1999) (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir.1998)). Where the hostile work environment is caused by a non-supervisory co-worker, "the burden falls to the plaintiff to prove that the employer did not take reasonable steps to address the situation." *Rechichi v. Eastman Kodak Co.*, 2004 WL 1698333, at *6–7 (W.D.N.Y. Jan. 21, 2004) (quoting *Bartniak v. Cushman & Wakefield, Inc.*, 223 F.Supp.2d 524, 529 (S.D.N.Y.2002)) (citations omitted). In order to prevail on a claim of a hostile work environment created by a co-worker, a plaintiff must establish that the employer itself was negligent in allowing the harassment to transpire. *Id.* (citing *Distasio*, 157 F.3d at 63–64). If the employer is found to have been on notice of the sexual harassment, summary judgment is inappropriate where there is evidence that presents an issue of fact as to whether the employer's action was "effectively remedial and prompt." *Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998), *abrogated on other grounds by Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir.1996)).

█ In the present case, defendants had actual knowledge of the harassment. Although there can be no dispute that the County provided a reasonable avenue of complaint because there was a sexual harassment policy in place and the complaint was investigated by the SIU, there exists an issue of fact as to whether the County's response to plaintiffs' complaints was "effectively remedial and prompt." Plaintiffs allege that the initial investigation focused on determining the source of the letters, and not investigating the sexual harassment allegedly perpetrated by Banks, even though plaintiffs specifically named Banks in their initial complaint. (Pls. Mem. Opp. Summ. J. at 20–21.) Months passed before the actions of Banks, other officers, and inmates were addressed. (*Id.*) While we find merit in defendants' argument that plaintiffs did not complain to anyone of continuing harassment after the investigation was under way and that defendants cannot be liable for failure to correct behavior that they had no reason to know about, we find that a reasonable jury could conclude that the County did not take reasonable care to prevent the harassment or act promptly to correct it. Accordingly, summary judgment is denied.

### B. Liability of Individual Defendants Under Title VII

█ The Second Circuit has held that "an employer's agent may not be held individually liable under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995), *abrogated on other grounds by Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633; *see also Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir.2003) (affirming dismissal of plaintiff's Title VII claims against defendant in his personal capacity because "under Title VII individual supervisors are not subject to liability"); *Ramirez*, 129 F.Supp.2d at 678 (dismissing Title VII claim against individual defendant who was the alleged harasser). Accordingly, to the extent that plaintiffs seek to hold the individual defendants liable under Title VII for alleged sexual harass-

ment and creating a hostile work environment, that claim is dismissed. Individual liability, however, is possible under 42 U.S.C. § 1983 and New York's Human Rights Law; thus, plaintiffs may proceed on such claims against the individual defendants. *See Gregory v. Daly*, 243 F.3d 687, 689 n. 1 (2d Cir.2001); *see also* DISCUSSION, *infra* Parts III.B., IV.

### III. Hostile Work Environment Claims Under Section 1983

A plaintiff may file suit under § 1983 against any individual acting under the color of state law who caused him or her to be deprived "of any right, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."); *Brown v. Middaugh*, 41 F.Supp.2d 172, 190 (N.D.N.Y.1999). In their Complaint plaintiffs allege violations of their First, Fifth and Fourteenth Amendments rights. (Pls.Mem.Opp.Summ. J., Ex. 1.) [13]

The Second Circuit has held that claims of sexual harassment, brought under the Equal Protection Clause, are actionable under § 1983. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144 (2d Cir.1993) ("[S]exual harassment of women constitutes disparate treatment because of gender and is actionable under Section 1983."). A § 1983 claim is actionable where a public official creates a hostile work environment. *Id.* at 143–44. However, a § 1983 claim may not "be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir.2004). Nevertheless, " '[a] Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action,' such as a claim for denial of equal protection, 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.' " *Id.* (quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir.1994)).

In the present action, plaintiffs base their § 1983 claims on defendants' alleged violations of their rights under the Equal Protection Clause. Plaintiffs allege that they received disparate treatment vis-à-vis similarly-situated injured males and were targeted for adverse treatment based upon their gender. They contend that the County has "maintained a policy and/or practice and/or custom of according disparate treatment to female corrections officers." (Complt.¶ 13.) Plaintiffs further allege that DeCuiceis, Banks, Pozzi, Miranda and Davis were "aware of and condoned, encouraged and ratified the disparate treatment to female corrections officers." (Complt.¶¶ 14–18.) Because Equal Protection, not Title VII, is the distinct right alleged to have been denied, plaintiffs may assert their claims under § 1983. *See Lange v. Town of Monroe*, 213 F.Supp.2d 411, 419 (S.D.N.Y.2002) (Conner, J.) (citing *Carrero*, 890 F.2d at 575).

A § 1983 claim has two essential elements: (1) defendants acted under color of state law; and (2) as a result of defen-

---

**13.** The First Amendment claim is no longer at issue as the dismissal of the retaliation claims was affirmed by the Second Circuit on the basis that plaintiffs have not been subjected to any adverse employment action. Additionally, as defendants correctly point out, the Complaint alleges that plaintiffs' Fifth and Fourteenth Amendments rights were violated, but does not specify under what theory. Based on a reading of the Complaint, we assume that plaintiffs' claims involves the alleged denial of equal protection as they discuss the disparate treatment of female officers.

dants' actions, plaintiffs were denied federal statutory or constitutional rights or privileges. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998). "An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees." *Id.* at 245. Plaintiff need not show that a discriminatory reason was the only reason for the disparate treatment, but only that it was a substantial or motivating one. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Thus, to state an equal protection violation, plaintiffs must demonstrate that: (1) compared with others similarly situated, they were selectively mistreated; and (2) that selective treatment was motivated by an intent to discriminate on an impermissible basis, such as gender. *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996).

Because there are no clearly articulated standards in this Circuit with respect to hostile work environment claims under § 1983, we must look to Title VII for "significant guidance." *Cohen v. Litt*, 906 F.Supp. 957, 963 (S.D.N.Y.1995) (citing *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185–86 (7th Cir.1986)). Consequently, adapting the standards of Title VII to the Equal Protection Clause, it has been held that a plaintiff makes out an equal protection hostile work environment claim by showing: (1) intentional harassment, (2) based on sex, (3) under color of state law, that is (4) sufficiently extensive to render the work environment hostile to plaintiff. *See Lange*, 213 F.Supp.2d at 423 (citing *Cohen*, 906 F.Supp. at 964).

The Second Circuit concluded that the crucial question in a gender-based hostile work environment case like the present one is "whether the workplace atmosphere, considered as a whole, under-mined plaintiffs' ability to perform their jobs, compromising their status as equals to men." *Dawson*, 373 F.3d at 274. Based on the record before us, we conclude that plaintiffs have shown that they were treated differently because of their gender. As discussed *supra*, Part II., plaintiffs have provided sufficient evidence to demonstrate intentional harassment, based on sex, sufficiently extensive to render the work environment hostile. In fact, the Second Circuit has already found that the evidence presented was sufficient support for a hostile work environment claim to survive summary judgment. Additionally, plaintiffs have adequately shown that Banks acted under the color of state law. The Supreme Court has noted that "a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122–23 (2d Cir.2004) (quoting *Polk County v. Dodson*, 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal quotations omitted)). "'[S]tate employment is generally sufficient to render the defendant a state actor.'" *Id.* at 123 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Furthermore, defendants who conduct themselves as supervisors for a public employer are, as a matter of law, acting under the color of state law. *See Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir.1994). Banks was acting under the color of state law and in his official capacity as a sergeant when he acted in an allegedly discriminatory and harassing manner. Banks, as plaintiffs' superior, told plaintiffs he would investigate the source of the letters in his official capacity, but apparently failed to do so. Accordingly, we conclude that Banks was acting in his official capacity. Therefore,

we must now determine which defendants are liable pursuant to § 1983 for the violations creating the hostile work environment.

## A. The County's Liability Under Section 1983

A county may not be held liable under a *respondeat superior* theory for § 1983 violations creating a hostile work environment. Rather, liability for the county may only be found " 'when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy, inflicts the injury.' " *Aggarwal v. N.Y. City Health & Hosp. Corp.*, 2000 WL 172787, at *7 (S.D.N.Y. Feb.10, 2000) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *accord Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130, 142–43 (2d Cir.1999). Banks clearly was not such a policy maker. Thus his employer, the County "may be held liable under Section 1983 only when the deprivation of rights is caused pursuant to 'a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.' " *Carrero*, 890 F.2d at 576–77 (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). The plaintiffs must "point to evidence supporting an inference that such a policy or practice exists" to establish a § 1983 claim against the County. *Richardson v. Westchester County*, 1998 WL 373422, at *6 (S.D.N.Y. July 6, 1998).

In the case at bar, plaintiffs have not been able to identify any policy or practice within the Department that could be responsible for differential treatment of female corrections officers. Although the individual defendants, including Banks, exercised some discretion in handling plaintiffs' complaints regarding the letters and the individual defendants other than Banks

exercised some discretion in investigating Banks' alleged harassment, " 'discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.' " *Carrero*, 890 F.2d at 577 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policy-making authority").

Furthermore, "[w]here a plaintiff claims that a facially valid municipal policy has led to constitutional injury, the plaintiff must demonstrate that the municipal action was taken with 'deliberate indifference' to the obvious or known unconstitutional consequences of that policy—a showing of simple or heightened negligence will not suffice." *Zappala v. Albicelli*, 980 F.Supp. 635, 639 (N.D.N.Y.1997) (citations omitted). However, plaintiffs have failed to allege or provide any evidence that the County acted with the "deliberate indifference" necessary for a § 1983 violation. Plaintiffs have not provided any evidence other than the conclusory statement that the County "maintained a policy and/or practice and/or custom of according disparate treatment to female corrections officers" to show that the County had a policy or custom of subjecting female COs to a sexually hostile work environment or disparate treatment. In fact, the record demonstrates that the County had a policy against sexual harassment and discrimination and required employees to attend training with respect to sexual harassment. Therefore, this Court finds as a matter of law that the actions taken by Banks and the other individual defendants, even if they were found to be dis-

criminatory, were not the result of the County's policy. Accordingly, plaintiffs' § 1983 claim against the County is dismissed.

## B. *Individual Defendants' Liability Under Section 1983*

 Plaintiffs have named Banks, Miranda and Pozzi in their individual capacities. Although the plaintiffs may not prevail against the County pursuant to a § 1983 claim, a § 1983 cause of action may be brought against individual defendants.

In order for an individual to be liable under § 1983, the plaintiff must demonstrate that the defendant is personally involved in the alleged constitutional violation. Personal involvement can mean either (1) direct participation, (2) failure to remedy the wrong after learning of it, (3) creation of a policy or custom under which unconstitutional practices occurred, or (4) gross negligence in managing subordinates.

*Id.* at 639–40 (citing *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). However, a defendant in a § 1983 action is not liable simply on the basis of holding a high position of authority. *Black,* 76 F.3d at 74.

Under this rubric, it is clear that plaintiffs have presented sufficient evidence to permit the conclusion that Banks was personally involved in the matters that form the crux of plaintiffs' § 1983 claim. Banks was at the center of the allegedly discriminatory and harassing actions that plaintiffs claim led to the hostile work environment; therefore, we find that he was personally involved in the alleged equal protection violations via direct participation. The Second Circuit has already determined that plaintiffs have provided sufficient evidence of a hostile work environment to reach a jury. Consequently, a § 1983 claim has been established against defendant Banks to the extent necessary to survive summary judgment.

 Moreover, plaintiffs allege that Miranda and Pozzi failed to adequately investigate their complaints, particularly the alleged sexual harassment perpetrated by Banks against plaintiffs. According to plaintiffs, "[n]othing was done for months. Five months after the letters were reported to defendants no action had been taken to prevent circulation of the letters and Banks had not been transferred." (Pls. Mem. Opp. Summ. J. at 25.) Viewing the evidence in the light most favorable to plaintiffs, we agree with plaintiffs that there is sufficient factual support for a jury finding that Pozzi and Miranda did not adequately and promptly remedy the hostile work environment because, even though there was an investigation concerning plaintiffs' complaints, no actions were taken for almost five months to remedy the hostile work environment. However, we find persuasive defendants' argument that "Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment, *when through this failure, the conduct becomes an accepted custom or practice of the employer.*" (Defs. Reply Mem. Supp. Summ. J. at 9 (emphasis in original) (quoting *Gierlinger,* 15 F.3d at 34).) Even though plaintiffs have provided evidence to establish that Pozzi and Miranda failed to take timely action to remedy Banks' alleged harassment and the alleged hostile work environment, plaintiffs' have not provided sufficient evidence to demonstrate that, because of this failure, sex discrimination and a gender-hostile work environment became the accepted custom or practice of the County or Correctional Facility. Moreover, Banks was ultimately transferred and the hostile work environment and inappropriate behavior

did eventually cease. Plaintiffs have not alleged any facts or offered any evidence tending to show that although Pozzi and Miranda had actual notice of the sexual harassment, they demonstrated deliberate indifference in failing to remedy it more promptly. *See Wise v. N.Y. City Police Dep't*, 928 F.Supp. 355, 369 (S.D.N.Y.1996) (finding summary judgment inappropriate where defendant had actual or constructive notice of sexual harassment and evidence presented demonstrated deliberate indifference in failure to remedy). Although we find that there is a question of fact as to whether the actions taken by defendants to remedy the hostile work environment were sufficiently adequate and prompt for purposes of Title VII analysis, there are no material disputed issues of fact concerning Pozzi's and Miranda's personal involvement in the alleged equal protection violations. The hostile work environment was eventually remedied and did not become a custom or practice of the County or Correctional Facility. A defendant may not be liable "merely by his connection to the events through links in the chain of command." *Prince v. Edwards*, 2000 WL 633382, at *6 (S.D.N.Y. May 17, 2000) (internal quotations omitted). Accordingly, Pozzi and Miranda are not liable under § 1983 and summary judgment is granted with respect to these defendants. However, because we find Banks was personally involved in the alleged deprivation of plaintiffs' right be free from a hostile work environment, he can be properly sued for damages under § 1983, and we must now determine whether Banks is shielded from liability under the doctrine of qualified immunity.

### 1. *Qualified Immunity*

The purpose of the qualified immunity doctrine is to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Jemmott v. Coughlin*, 85 F.3d 61, 66 (2d Cir.1996) (internal citations and quotations omitted). "Public officials sued in their individual capacity are entitled to qualified immunity from suit unless '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Back*, 365 F.3d at 129 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Further, "'even assuming a state official violates a plaintiffs' constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.'" *Id.* (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir.2004)); *see also Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000) ("[A] defendant is entitled to the shield of qualified immunity if the allegations of the complaint fail to state a claim that his conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quotations omitted). In assessing a qualified immunity claim, a court must consider:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Back*, 365 F.3d at 129–30 (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

Applying this standard to the present case, we conclude that defendant

Banks is not entitled to qualified immunity. It is clear that when the alleged discrimination and harassment occurred, plaintiffs had a constitutional right to be free from a gender-hostile work environment. "It is well-settled that the Fourteenth Amendment's protection extends to the right not to be discriminated against because of one's gender." *Rucci v. Thoubboron*, 68 F.Supp.2d 311, 327 (S.D.N.Y. 1999) (Conner, J.); *see also Gonzalez v. N.Y. State Dep't of Corr. Servs. Fishkill Corr. Facility*, 122 F.Supp.2d 335, 348 (N.D.N.Y.2000) ("[F]reedom from discrimination on account of gender and race ... are clearly established rights."). Banks was the cause of the alleged hostile work environment and under preexisting law a reasonable defendant official would have understood that his acts were unlawful. Therefore, Banks is not protected against liability under the doctrine of qualified immunity and his motion for summary judgment as to plaintiffs' § 1983 claim against him is denied.

## IV. *State Law Claims*

New York State Human Rights Law (the "NYSHRL") provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice ... for an employer ... because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of an individual ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. L. § 296(1)(a). "In addition, the NYSHRL states that it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'" *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir.2004) (quoting N.Y. Exec. Law § 296(6)).

New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under a federal Title VII claim; therefore, a hostile work environment claim under N.Y. Exec. L. § 296 is analyzed in the same manner as a Title VII claim. *See Quinn*, 159 F.3d at 765. This is so because the New York law essentially mirrors Title VII. *See Torres*, 116 F.3d at 629 n. 1 (recognizing claims under the NYSHRL are analytically identical to claims under Title VII). Therefore, "[o]ur rulings as to the federal discrimination claims pertain equally to the state and local claims." *Petrosino*, 385 F.3d at 220 n. 11. Consequently, we conclude that plaintiffs have presented sufficient evidence to impute liability to the County under the NYSHRL for a hostile work environment to the extent of precluding summary judgment. *See supra*, Part II.A.

■ However, New York law differs from federal law in one significant respect: New York allows for liability of individual defendants on the basis of a hostile work environment claim. The Second Circuit has concluded that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable" under the NYSHRL. *Tomka*, 66 F.3d at 1317; *see also Lee v. N.Y. State Dep't of Health*, 2001 WL 34031217, at *11 (S.D.N.Y. Apr. 23, 2001) (quoting *Tomka* in recognizing personal liability exists for discrimination under the NYSHRL and NYCHRL).

Relying on the holding in the New York State Court of Appeals case, *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984), courts in this Circuit have found that an individual employee is not liable under the NYSHRL " 'if he isn't shown to have any ownership interest or any power to do more than carry out personnel decisions made by oth-

ers.'" *Bigelow v. N.Y. State Dep't of Corrs.*, 1997 WL 733867, at *3 (N.D.N.Y. Nov. 7, 1997) (quoting *Patrowich*, 483 N.Y.S.2d at 660, 473 N.E.2d 11). However, as mentioned earlier, the Second Circuit has determined that personal liability can also be established under the NYSHRL if an employee participates in the discriminatory conduct, even if the employee is not shown to have any power to do more than carry out personnel decisions made by others. *See Chamblee v. Harris & Harris, Inc.*, 154 F.Supp.2d 670, 677 (S.D.N.Y.2001) (citing *Tomka*, 66 F.3d 1295). The Second Circuit explained, a supervisor is an "employer" within the meaning of the NYSHRL and subject to personal liability, if the supervisor "'actually participates in the conduct giving rise to [the] discrimination.'" *Feingold*, 366 F.3d at 157 (quoting *Tomka*, 66 F.3d at 1317).

Additionally, the Second Circuit has gone even further and found personal liability for co-workers who "actually participate[s] in the conduct giving rise to a discrimination claim" irrespective of whether that co-worker had the authority to either hire or fire the plaintiff. Such liability is premised on the language of the NYSHRL which states that it is an unlawful discriminatory practice "'for any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so.'" *Feingold*, 366 F.3d at 157–58 (citing *Tomka*, 66 F.3d at 1317) (quotations omitted).[14]

■ In the case at bar, plaintiffs have alleged that Banks, Pozzi and Miranda cre-ated a hostile work environment. The Second Circuit has already determined plaintiffs have presented sufficient evidence to support a claim of a hostile work environment to reach a jury. Banks, as alleged by plaintiffs, created a hostile work environment by allegedly distributing copies of the letters to other officers, making inappropriate comments to plaintiffs, staring at plaintiffs in a disturbing manner and engaging in inappropriate conversations with others within plaintiffs' hearing. Consequently, Banks may be sued in his personal capacity under N.Y. EXEC. L. § 296(6). *See Duviella v. Counseling Service of E. Dist. of N.Y.*, 2001 WL 1776158, at *18 (E.D.N.Y. Nov. 20, 2001) (recognizing that primary perpetrator of alleged sexual harassment may be liable under NYSHRL). Plaintiffs further allege that Pozzi and Miranda created a hostile work environment by failing to adequately and promptly remedy Banks' alleged sexual harassment and the resulting hostile work environment. However, New York affords government officials and employees immunity for discretionary conduct. *See, e.g., Hiller v. County of Suffolk*, 81 F.Supp.2d 420, 422 (E.D.N.Y.2000); *Arteaga v. State*, 72 N.Y.2d 212, 216, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988); *Tango v. Tulevech*, 61 N.Y.2d 34, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983). Whether government officials or employees may be "held individually liable [but protected by common-law immunity] under the Human Rights Law for their conduct in this matter [namely, employment decisions challenged under NYSHRL], has not been decided by the

---

**14.** In *Feingold*, the Second Circuit recognized that "[t]hough state courts are not in unanimous agreement with this aspect of our decision in *Tomka* [finding personal liability if an employee participates in conduct giving rise to a discrimination claim], the majority of courts that have considered the issue have affirmed the existence of a cause of action against individual defendants under the aid-or-abet provision of the NYSHRL." 366 F.3d at 158 n. 19 (collected cases omitted). Consequently, this is the law on which we will base our decision of whether Banks, Pozzi and Miranda are subject to individual liability under the NYSHRL for plaintiffs' hostile work environment claim.

Court of Appeals or by any lower court." *Hiller*, 81 F.Supp.2d at 423. Relying on New York case law concerning immunity which "appear[s] to stand for the proposition that, although immunity is not always absolute, individual public officials enjoy at least qualified immunity from liability for 'official action that involves the exercise of discretion or expert judgment in policy matters,'" the court in *Hiller* determined that government officials and employees "enjoy qualified immunity with respect to . . . Human Rights Law claims." *Id.* (quoting and citing *Mon v. City of New York*, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (1991)). Thus, government officials or employees who make decisions that are discretionary, but not judicial in nature, are entitled to qualified immunity unless "there is bad faith or the action is taken without a reasonable basis," even where a claim is based on a violation of the NYSHRL. *Hiller*, 81 F.Supp.2d at 424 (quoting *Arteaga*, 72 N.Y.2d at 216, 532 N.Y.S.2d 57, 527 N.E.2d 1194). A discretionary decision or act involves "the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Tango*, 61 N.Y.2d at 41, 471 N.Y.S.2d 73, 459 N.E.2d 182.

Applying these principles, we conclude that both Pozzi and Miranda enjoy qualified immunity with respect to plaintiffs' NYSHRL claims against them. Their actions involving the investigations into plaintiffs' complaints and the actions taken as a result were discretionary in nature, involving the exercise of reasoned judgment. There is no evidence in the record to support a finding that the investigation, while perhaps not resulting in a prompt and adequate remedy, was undertaken in bad faith or without a reasonable

basis. In fact, Pozzi ordered the SIU to conduct several follow-ups to the investigation to try to ensure plaintiffs' complaints were addressed. Therefore, Pozzi and Miranda have the benefit of qualified immunity and are shielded from civil liability under the NYSHRL in their individual capacities.

Consequently, under the standard set forth in *Tomka*, the allegations presented by plaintiffs are sufficient to satisfy a claim under N.Y. Exec. L. § 296(6) against Banks to the extent of precluding summary judgment, but not against Pozzi and Miranda as they are immune from civil liability under New York's common-law doctrine of qualified immunity. Accordingly, defendants' motion for summary judgment on this claim is granted with respect to Pozzi and Miranda, but denied with respect to the County and Banks.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. The defendant County of Westchester's (the "County") motion for summary judgment is denied with respect to plaintiffs' hostile work environment claims under Title VII and New York State Human Rights Law (the "NYSHRL"), but is granted with respect to plaintiffs' § 1983 claims. Plaintiffs' hostile work environment claims under Title VII as against defendants Phillip Banks, Rocco Pozzi and Joseph Miranda are dismissed. The individual defendants' motion for summary judgment as to plaintiffs' hostile work environment claim under § 1983 is granted as against Pozzi and Miranda, but denied as to Banks. The individual defendants' motion for summary judgment as to plaintiffs' hostile work environment claim under the NYSHRL is granted as to Pozzi and Miranda, but denied as to defendant Banks.

Accordingly, plaintiffs' hostile work environment claims under Title VII against Banks, Miranda and Pozzi are dismissed and plaintiffs' hostile work environment claims under § 1983 against the County, Miranda and Pozzi are dismissed. In addition, plaintiffs' hostile work environment claims under the NYSHRL against Miranda and Pozzi are dismissed.

SO ORDERED.